## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STEVEN A. VONEIDA,** | : | **CIVIL ACTION NO. 1:15-CV-1911** |
| | : | |
| **Petitioner** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN A. JOHNSON,** | : | |
| | : | |
| **Respondent** | : | |

### MEMORANDUM

This is a habeas corpus case under 28 U.S.C. § 2241 in which petitioner Steven A. Voneida challenges his 2008 conviction in this judicial district for transmitting threats in interstate commerce. We previously dismissed this case for lack of jurisdiction, but the Third Circuit Court of Appeals reversed and remanded for consideration of whether Voneida could establish his actual innocence in light of the United States Supreme Court's holding in <u>Elonis v. United States</u>, 575 U.S. 723 (2015). Consistent with our court of appeals' guidance, we have since conducted an evidentiary hearing and received supplemental briefing from the parties. Upon consideration of that additional information, we will deny the petition for writ of habeas corpus.

## I.    Factual Background & Procedural History

On February 11, 2008, Voneida was convicted of transmitting threatening communications in interstate commerce in violation of 18 U.S.C. § 875(c) following a jury trial before United States District Judge Sylvia H. Rambo. <u>See United States v. Voneida</u>, No. 1:07-CR-312 (M.D. Pa. Sept. 18, 2008). The court sentenced Voneida

to a term of imprisonment of nineteen months followed by three years of supervised release.

Evidence at trial established that on April 18, 2007, two days after the Virginia Tech mass shooting,[1] Voneida posted several statements to his Myspace[2] page that referenced the shooting.  See United States v. Voneida, 337 F. App'x 246, 248 (3d Cir. 2009).  Voneida posted these statements while responding to prompts in a survey that asked Myspace users to "[w]rite exactly what[']s on your mind and don't change it."[3]  Among other statements, Voneida wrote the following:

7.      I lost my respect for : the sanctity of human life[.]

11.     Someday : I'll make the Virginia Tech incident look like a trip to an amusement park.

21.     Today I : went to school and was shocked that the students were actually surprised that there are people out there who would shoot them if given the opportunity.

22.     I wish : that the weary violent types who are sick of the self-righteous, lecherous, arrogant and debaucherous attitudes displayed by american youth would band together with me for a day, and allow

---

[1] On April 16, 2007, a student at Virginia Polytechnic Institute and State University in Blacksburg, Virginia named Seung-Hoi Cho committed a mass shooting on the university's campus.  See Virginia Tech Shooting, WIKIPEDIA, https://en.wikipedia.org/wiki/Virginia_Tech_shooting (last visited Jan. 28, 2022). Thirty-two people were killed during the shooting and another seventeen were wounded.  Id.

[2] Myspace is a social networking website where users can share content with one another.  See MYSPACE, https://Myspace.com/ (last visited Jan. 28, 2022). Although its popularity has significantly declined in recent years, Myspace was the largest social networking website in the world from 2005 to 2009.  See Myspace, WIKIPEDIA, https://en. wikipedia.org/wiki/Myspace (last visited Jan. 28, 2022).

[3] The court will quote statements exactly as they appeared on Voneida's Myspace page.

everyone at schools and universities across the nation to reap the bitter
fruit of the seeds that they have been sowing for so long.

(Evidentiary Hearing Exhibit 1.)

The next day, Voneida posted a picture on his Myspace page that included

the caption "Virginia Tech Massacre – They got what they deserved" and listed his

"current mood" as "extatically happy" [sic].  (Evidentiary Hearing Exhibit 2.)  The

picture depicted an image of the Virginia Tech shooter holding up two pistols

superimposed on a cross bordered by the words "massacre," "enrage,"

"recompence," and "martyr."  (Id.)  Voneida also posted a poem called "The Ballad

of Cho seung-hui" below the image, which glorified the actions of the shooter as

follows:

> Seung-Hui Cho, the man, you know,
> who spoke but none would hear.
> 'Till Charon came, his boat aflame,
> And full of Hade's cheer.
>
> He served them down to Hades, hence
> to reep [sic] what they had sown,
> He served them up to recompence
> Their crimes that he had known.
>
> He served them once, he served them twice
> he served them three times ten.
> He served them 'till the ferry filled,
> and served them once again.
>
> And in the wake of Justice' sake,
> when Libra's scale had come to break,
> The Law came forth to guard the fake
> from Justice and her might ache.
>
> Woe to thee who intervened
> and halted Ares'Hand! [sic]
> His wrath undaunted and unquenched
> shall sweep across the land!

(Id.)

Voneida's statements on Myspace were seen by a student at Indiana University of Pennsylvania ("IUP") who was on Voneida's Myspace friend list.[4] 337 F. App'x at 248.  The student showed the statements to another IUP student, and together they subsequently reported it to authorities.  Id.

After being charged and convicted in this district, Voneida appealed to the United States Court of Appeals for the Third Circuit, arguing there was insufficient evidence to support his conviction.  Id. at 247.  The court of appeals affirmed the judgment of sentence on July 15, 2009.  Id. at 250.  Applying then-binding circuit precedent, the court held that the government had no burden to prove that Voneida intended the statements to be threatening.  Id. at 249.  Voneida subsequently filed several motions to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, all of which were denied or dismissed by the district court.  See Voneida, No. 1:07-CR-312.

Seven years after Voneida's conviction, the Supreme Court announced its decision in Elonis, 575 U.S. at 723, which clarified the mental state necessary for a conviction of transmitting threatening communications in interstate commerce under 18 U.S.C. § 875.  Overruling precedent from the Third Circuit and other courts of appeals, the Court held that a negligent state of mind was not sufficient to

---

[4] Generally speaking, Myspace allowed users to become friends on the website with other users, which allowed them to see content on each other's profile that was not otherwise viewable by the general public.

support a conviction under § 875.  Id. at 741.  The Court declined to decide whether a reckless state of mind could support a conviction but clarified that "the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat."  Id. at 740.

Voneida filed the instant petition on October 2, 2015, asserting that the conduct supporting his conviction was rendered noncriminal by Elonis.  (Doc. 1). We dismissed the petition for lack of jurisdiction on October 16, 2015, finding that Voneida's only recourse was to seek leave to file a successive motion under 28 U.S.C. § 2255.  (Docs. 4-5).  Voneida appealed.

On appeal, the Third Circuit vacated this court's decision.  Voneida v. Att'y Gen. Pa., 738 F. App'x 735, 739 (3d Cir. 2018).   The court concluded that Voneida could bring his claim through a petition for writ of habeas corpus under Section 2241 because Elonis "effected an intervening change in substantive law which may render Voneida's conduct no longer criminal" and Voneida had no earlier opportunity to raise a claim based on Elonis.  Id. at 737.   The court accordingly remanded the case with instructions to consider whether the evidence supported Voneida's claim of actual innocence.  Id. at 738-39.  We appointed counsel to represent Voneida and scheduled an evidentiary hearing, which was held on September 9, 2021.  During the hearing, the court heard testimony from Voneida and two of his friends who contemporaneously saw the relevant Myspace posts, Joshua Washburne and Shawn Hoover.

The court first heard testimony from Washburne, who testified that he has known Voneida since the two became classmates in seventh or eighth grade. (Doc. 44 at 5-6). Both Washburne and Voneida were "somewhat reclusive and not very social" when they met, which led them to "kind of hit it off early." (Id.) They became good friends, maintained contact with one another, and "pretty much did a lot of things together throughout the years." (Id. at 6).

Washburne testified that he and Voneida were Myspace friends in April of 2007 and that he saw the statements Voneida made when he was logged into the website. (Id. at 6-8). Washburne testified that Voneida often posted surveys that were similar to the one at issue in this case and that such surveys were a popular trend on Myspace at the time. (Id. at 10). According to Washburne, Voneida's responses to these surveys were "usually in the context of just being funny or trying to get a rise out of people," which "was typically Steve's form of humor." (Id.) Washburne testified that when he first saw the survey posted by Voneida, he quickly browsed it, realized it was "just one of those things again," and then immediately disregarded it. (Id. at 12).

When asked what reaction he had to Voneida's statements about the Virginia Tech shooting, Washburne testified that this was "Steve being Steve again." (Id. at 13). Washburne elaborated that Voneida:

> [H]ad a tendency to post some very questionable nonsocially acceptable content just to be funny, to get a rise out of people. It did not necessarily reflect my viewpoint or really anyone else's. It was more or less just a let's see how big of a shock I can give people and see what kind of response I did.

(<u>Id.</u>)  Washburne testified that when he viewed the particular comments that Voneida made about the Virginia Tech shooting, his reaction was "oh, okay, it's just Steve making a bunch of brash comments" and Washburne accordingly "didn't think anything of it."  (<u>Id.</u>)  Washburne also testified that Voneida had always had a "dark" and "twisted" sense of humor and that the sense of humor had "never really left" Voneida.  (<u>Id.</u> at 14).  On cross-examination, Washburne stated he and Voneida often made "dark humor" jokes when they were classmates which "were typically about violent or sexual acts."  (<u>Id.</u> at 17-18).

Washburne further testified on cross-examination that at the time of the posts that gave rise to Voneida's conviction, the Virginia Tech shooting was on everyone's mind.  (<u>Id.</u> at 19).  Washburne understood why other people viewing the posts on Voneida's Myspace page would view the posts as disturbing.  (<u>Id.</u> at 20).  Washburne testified that he thought Voneida "[w]as trying to get a response out of people . . . he was trying to see how people would react to it."  (<u>Id.</u> at 22).

The court next heard testimony from Hoover, who testified he had known Voneida for approximately twenty years and that he was friends with Voneida on Myspace in 2007.  (<u>Id.</u> at 30).  Hoover testified that he saw Voneida's April 18, 2007 statements but that he "had no reaction" to them and was not concerned by them.  (<u>Id.</u> at 31-32).  Hoover explained that "Steve was just being Steve, and it just didn't bother me."  (<u>Id.</u> at 32).  He noted that Voneida had a "morbid" and "strange" sense of humor and that he shared a similar sense of humor.  (<u>Id.</u>)  Hoover testified that he also had no reaction to Voneida's April 19, 2007 post regarding the Virginia Tech shooting and that he did not view it as a threat.  (<u>Id.</u> at 33-34).

On cross-examination, Hoover testified that Voneida liked to shock and scare people.  (Id. at 40).  He also acknowledged that the Virginia Tech shooting was fresh in the minds of people around him at the time Voneida made the statements on his Myspace page.  (Id. at 41-42).  Hoover testified that he understood why other people seeing Voneida's Myspace posts would view them as threatening, but that he thought Voneida's statements were funny.  (Id. at 42).  When asked to explain, Hoover stated, "Like I said, we have a different sense of humor."  (Id.)

Voneida was the last witness to testify at the evidentiary hearing.  Voneida testified about his mindset when he posted the survey on Myspace: "I was trying to be as spontaneous and random as I possibly could.  So whatever first, I turned my filter off, whatever came to mind, that's what went in. . . . I just said exactly the first thing that came to mind like it was asking."  (Id. at 49-50).  Voneida stated that he was not necessarily looking for "a particular reaction" from people and that he was not sure that other people would actually see the post.  (Id. at 50).  Voneida testified that he thought he was being funny and provocative with some of his answers to the survey questions and that the survey was "basically something to do."  (Id. at 50-51).

Voneida stated that he did not intend to harm anyone when he posted the statement that he would make the Virginia Tech shooting "look like a trip to an amusement park."  (Id. at 51).  Voneida testified that he posted the caption "Virginia Tech Massacre – they got what they deserved" with the intent "to get a rise out of people to see what kind of response that I could get."  (Id. at 54).

Voneida also testified about a past criminal offense he committed.  When Voneida was 13 years old in 1997, he shot a gun out of his bedroom window at a stop

sign.  (<u>Id.</u> at 55-56).  Multiple children were standing underneath the stop sign at the time Voneida shot the gun, but he testified that he was not aware children were in the immediate vicinity because of a hill between the stop sign and his window that blocked his view of the children.  (<u>Id.</u> at 56).  Voneida was prosecuted as a juvenile and received a sentence of six months of probation.  (<u>Id.</u>)  At the close of his direct examination, Voneida testified that he did not intend to threaten anyone when he posted the Myspace comments about the Virginia Tech shooting.  (<u>Id.</u>)

On cross-examination, Voneida testified that he was a student at the Harrisburg campus of Pennsylvania State University at the time he posted the comments on Myspace and that he was living in his parents' home at the time.  (<u>Id.</u> at 57).  Voneida understood that some people were upset and disturbed by his posts regarding the Virginia Tech shooting but stated that he only expected his Myspace friends would see the posts.  (<u>Id.</u> at 60).  Voneida was asked if he could see how someone would view his statements as threats, and Voneida responded, "Viewed out of context, yes."  (<u>Id.</u>)  He also testified that he spoke about the postings with campus police officers shortly after they were posted and acknowledged his understanding that the posts could be concerning to other people.  (<u>Id.</u> at 62).

Voneida testified that his classmates at Penn State were frequently talking about the Virginia Tech shooting in the days after it happened and that he knew his posts would elicit a reaction from them.  (<u>Id.</u> at 63).  He also testified as to whether he intended for people viewing the statements to think that he was going to commit a mass shooting:

**Q.**     And you said I think before that when you were doing these postings you wrote exactly what was on your mind, right?

**A.**     Yes.

**Q.**     This is what you were thinking?

**A.**     Yes.

**Q.**     At the time were you fantasizing about committing mass school shootings?

**A.**     What was your question?

**Q.**     You said you were writing about thinking and were you fantasizing at the time, were you thinking about committing a mass school shooting?

**A.**     I was not, no.

**Q.**     But you were writing about it.

**A.**     Writing about it?  Yea, it would have been one of the topics - -

**Q.**     Saying, you were saying you were going to do it.

**A.**     It was among the topics that came up in here.

(Id. at 64).

Voneida also testified about a cartoon he had posted on Myspace that depicted him holding a gun and a bloody knife with the following caption:

> For all the times I grit my teeth
> Until they broke and bled.
> Calmly standing where I was, and
> Killing you all in my head.
>
> You will reap what you have sown
> Over and over again
> Until you see what you have grown…

(Id. at 70-71; Evidentiary Hearing Exhibit 3). Voneida explained that he was not thinking about killing people when he posted the cartoon, but acknowledged that the cartoon depicted a stylized version of himself and that he posted the cartoon on his Myspace page. (Doc. 44 at 71-72).

Voneida testified that at the time of the relevant Myspace postings, there were multiple firearms in his residence that were accessible to him. (Id. at 73). Among other firearms, a Ruger Mini 14 rifle with a .223 caliber was stored in his old bedroom. (Id. at 73-74). Voneida testified that the Ruger Mini 14 rifle is not used for hunting and that it is a semiautomatic weapon. (Id. at 74). He also testified that the weapon was purchased by his father using Voneida's money and that he had ammunition for the weapon in the house. (Id. at 74-75). Voneida possessed multiple accessories for the Ruger firearm, including an extended magazine, an advanced optics device, and a muzzle break. (Id. at 75-76). Voneida testified that the muzzle break enables the gun to stay "pointed straight" after it is fired, which allows the shooter to get back on target quicker. (Id. at 76). In total, Voneida estimated that there were at least fifteen firearms in the residence. (Id.)

At the time of the relevant Myspace posts, Voneida was recently divorced from his wife. (Id. at 80). Although the divorce had occurred about a year prior to the posts, Voneida stated that he still had some "lingering" anger about the divorce and that he was "still getting over it." (Id.)

The court admitted into the record six exhibits during the evidentiary hearing. Exhibit 1 is the Myspace survey posted by Voneida on April 18, 2007. Exhibit 2 is the captioned picture of the Virginia Tech shooter that Voneida posted

on April 19, 2007, along with the associated comments.  Exhibit 3 is a compilation of four cartoons that Voneida posted to his Myspace page, including the depiction of Voneida holding a gun and a bloody knife.  Exhibit 4 is the search warrant, affidavit of probable cause, and receipt of inventory related to a search of Voneida's home in 2007.  Exhibit 5 is the transcript of the January 14, 2008 suppression hearing and trial in Voneida's parallel criminal case in the Dauphin County Court of Common Pleas, which arose from charges that Voneida illegally possessed firearms.[5]  Exhibit 6 is a compilation of police incident reports and witness statements related to the incident in which Voneida shot a gun at a stop sign.

At the conclusion of the evidentiary hearing, the court ordered supplemental briefing from the parties.  Supplemental briefing has now concluded, (see Docs. 45-47), and the petition is ripe for the court's disposition.

## II.   **Jurisdiction**

Federal prisoners seeking post-conviction relief from their judgment of conviction or the sentence imposed are generally required to bring their collateral challenges pursuant to 28 U.S.C. § 2255.  See 28 U.S.C. § 2255(e).  The Third Circuit Court of Appeals has observed that "[m]otions pursuant to 28 U.S.C. § 2255 are the presumptive means by which federal prisoners can challenge their convictions or sentences that are allegedly in violation of the Constitution." Okereke v. United States, 307 F.3d 117, 120 (3d Cir. 2002) (citing Davis v. United States, 417 U.S. 333,

---

[5] Voneida was found guilty of illegal possession of a firearm.  See Commonwealth v. Voneida, No. CP-22-CR-0003356-2007 (Dauphin Cnty. Jan. 14, 2008).

343 (1974)).  Section 2255(e), often referred to as the savings clause, specifically prohibits federal courts from entertaining a federal prisoner's collateral challenge by an application for habeas corpus unless the court finds that a Section 2255 motion is "inadequate or ineffective."  Id. at 120 (citing In re Dorsainvil, 119 F.3d 245, 251 (3d Cir. 1997)); 28 U.S.C. § 2255(e)).

To demonstrate that a Section 2255 motion is "inadequate or ineffective," the petitioner must show "that some limitation of scope or procedure would prevent a § 2255 proceeding from affording him a full hearing and adjudication of his wrongful detention claim."  Cradle v. United States ex rel. Miner, 290 F.3d 536, 538 (3d Cir. 2002) (per curiam).  Significantly, Section 2255 "is not inadequate or ineffective merely because the sentencing court does not grant relief, the one-year statute of limitations has expired, or the petitioner is unable to meet the stringent gatekeeping requirements of . . . § 2255."  Id. at 539.  "It is the inefficacy of the [Section 2255] remedy, not the personal inability to utilize it, that is determinative."  Id. at 538.

In Dorsainvil, the Third Circuit held that the remedy under Section 2255 is "inadequate or ineffective," permitting resort to Section 2241, when a prisoner who previously filed a Section 2255 motion on other grounds "had no earlier opportunity to challenge his conviction for a crime that an intervening change in substantive law may negate."  Dorsainvil, 119 F.3d at 251.

Our court of appeals has ruled that we have jurisdiction to consider Voneida's actual innocence argument under the Dorsainvil exception and has remanded the case with instructions to consider that argument.  See Voneida, 738

13

F. App'x at 737-39.  Hence, we proceed to the merits of Voneida's actual innocence

argument.

### III.  <u>Legal Standard</u>

The Supreme Court has never determined whether a petitioner may obtain

habeas corpus relief based on a freestanding claim of actual innocence.  <u>See</u> <u>Bruce</u>

<u>v. Warden Lewisburg USP</u>, 868 F.3d 170, 183 (3d Cir. 2017).  In the absence of

guidance from the Supreme Court, our court of appeals has instructed that habeas

corpus claims based on the petitioner's assertion of actual innocence should be

"initially tested against the more relaxed (but still stringent) actual innocence

gateway standard."  <u>Id.</u> at 184 (citing <u>United States v. Tyler</u>, 732 F.3d 241, 246 (3d

Cir. 2013)).  That standard requires a petitioner to show, in light of all the evidence,

that "it is more likely than not that no reasonable juror would have convicted him."

<u>Id.</u> (quoting <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998)).  This standard is

"purposefully demanding," and is only satisfied when the petitioner's case is "truly

extraordinary."  <u>Id.</u> (internal quotation marks omitted) (quoting <u>House v. Bell</u>, 547

U.S. 518, 537-38 (2006)).  The petitioner's failure to satisfy the actual innocence

gateway standard is sufficient for the court to reject "any hypothetical freestanding

actual innocence claim."  <u>Id.</u> (citing <u>Albrecht v. Horn</u>, 485 F.3d 103, 126 (3d Cir.

2007)).

In considering a claim of actual innocence under the gateway standard, a

court is not limited to the record that existed at trial, because actual innocence

means "factual innocence, not mere legal insufficiency."  <u>Id.</u> (quoting <u>Bousley</u>, 523

U.S. at 623-24).  The court is therefore "not bound by the rules of admissibility that

would govern at trial," and may consider "all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." Id. (internal quotation marks omitted) (quoting Schlup v. Delo, 513 U.S. 298, 327-28 (1995)).

The court's task in reviewing an actual innocence claim is not to exercise its own judgment as to whether a reasonable doubt existed, but rather to make a "probabilistic determination about what reasonable, properly instructed jurors would do." Id. (quoting Schlup, 513 U.S. at 329). The court must presume that the jurors would fairly consider all of the evidence presented and conscientiously adhere to the requirement that guilt be proven beyond a reasonable doubt. Id. (citing Schlup, 513 U.S. at 329).

## IV.   **Discussion**

In Elonis, 575 U.S. at 723, the Supreme Court clarified the *mens rea* the government must prove to secure a conviction for transmitting threats in interstate commerce under 18 U.S.C. § 875(c). Anthony Douglas Elonis had recently separated from his spouse, and he posted several statements on Facebook which appeared to threaten violence against his spouse, his coworkers, several police officers, the students at a nearby kindergarten, and an FBI agent. Id. at 726-31. Despite his assertion that the statements were meant only as fictitious rap lyrics, Elonis was indicted in the Eastern District of Pennsylvania for transmitting threats in interstate commerce in violation of Section 875(c). Id. at 731. He sought to have the indictment dismissed for failing to allege that he had intended to threaten

anyone, but the court denied the motion because then-binding Third Circuit precedent required only that Elonis "intentionally made the communication, not that he intended to make a threat." Id. Elonis subsequently sought a jury instruction stating that he could only be convicted if he intended to communicate a threat, but the court rejected the request and instead instructed that

> [a] statement is a true threat when a defendant intentionally makes a statement in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily injury or take the life of an individual.

Id. The jury convicted Elonis on four of the five counts in the indictment. Id. at 732. Elonis appealed, and the Third Circuit affirmed. Id.

The Supreme Court granted *certiorari* and reversed. The Court noted that when a criminal statute is silent as to the *mens rea* element, courts must read into the statute "that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." Id. at 736 (internal quotation marks omitted) (quoting Carter v. United States, 530 U.S. 255, 269 (2000)). In the context of a charge for transmitting threats in interstate commerce, "'the crucial element separating legal innocence from wrongful conduct' is the threatening nature of the communication." Id. at 737 (quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 73 (1994)). "The mental state requirement must therefore apply to the fact that the communication contains a threat." Id.

The Court concluded that the reasonable person standard applied by the district court, which the Court characterized as a negligence standard, was

"inconsistent with 'the conventional requirement for criminal conduct—*awareness* of some wrongdoing.'"  Id. at 737-38 (quoting <u>Staples v. United States</u>, 511 U.S. 600, 606-07 (1994)).  The Court held that a defendant may be convicted under Section 875(c) only if the government establishes that the defendant transmitted a communication either "for the purpose of issuing a threat" or "with knowledge that the communication will be viewed as a threat," but that a negligent state of mind is not sufficient.  <u>Id.</u> at 740-41.  The Court declined to decide whether a conviction could be obtained based on a reckless state of mind, leaving that issue for further development by lower courts.  <u>Id.</u>

Voneida argues that <u>Elonis</u> renders his conduct noncriminal: that his conviction and sentence should be vacated because there is no evidence he acted with the purpose of issuing a threat or with knowledge that his Myspace posts would be perceived as threats.  (Doc. 45 at 7).  Respondent argues to the contrary, that there is ample direct and circumstantial evidence of Voneida's purposeful or knowing *mens rea* such that Voneida cannot meet his burden to show his actual innocence.  (Doc. 46 at 5).

Having reviewed the evidence of record and the parties' arguments, we will deny Voneida's petition for writ of habeas corpus.  Voneida has failed to show that "it is more likely than not that no reasonable juror would have convicted him," <u>see</u> <u>Bruce</u>, 868 F.3d at 184, as there is significant evidence from which a reasonable juror could conclude that Voneida posted the relevant statements on Myspace either for the purpose of issuing a threat or, at minimum, with knowledge that the statements would be perceived as threats.

The most notable evidence working against Voneida is his own testimony. Voneida repeatedly denied that he acted with the purpose of issuing a threat. (Doc. 44 at 60). But he expressly acknowledged that his statements, when "[v]iewed out of context," could be seen as threats. (Id.) Similarly, Voneida testified that he was not thinking about committing a mass shooting when he posted the statements on Myspace, but he acknowledged that the possibility of him committing a mass shooting "was among the topics that came up" in his statements. (Id. at 64). These admissions by Voneida provide direct evidence that he knew other people would perceive his statements as threats, which is all that the government must prove under Elonis. Voneida's testimony—standing alone—is sufficient to refute his claim of actual innocence.

This direct evidence, however, is just the tip of the proverbial iceberg. Ample circumstantial evidence also supports Voneida's conviction. Voneida's assertion that he would someday "make the Virginia Tech incident look like a trip to an amusement park" was made *two days* after the Virginia Tech shooting, at a time when the shooting was a focal point of discussion across college campuses. During the hearing, Voneida admitted he knew the shooting was top-of-mind for his classmates, (see id. at 63), and he indicated that it was his goal to get a reaction—"a rise"—out of them, (see id. at 54). The timing of Voneida's statement coupled with his status as a college student and his knowledge of his classmates' concerns obviously allow a reasonable juror to infer that Voneida knew his statements would be perceived as threats.

Voneida's access to approximately fifteen firearms and apparent readiness to use them could also allow a reasonable juror to find the requisite *mens rea*. Voneida testified that many of the firearms in his house were used for hunting purposes and that everyone in his family was a hunter, (see id. at 83), but he also acknowledged that at least one of the firearms in the house—the Ruger Mini 14 rifle—was a semiautomatic weapon that would not be used for hunting, (id. at 73-74). Voneida testified that he owned several accessories for the semiautomatic weapon that enabled the weapon to hold additional ammunition and facilitated the user's ability to return to the target after firing a round. (Id. at 75-76). Reasonable jurors viewing this evidence could conclude that Voneida was prepared to commit a mass shooting, and, by extension, that he intended for his Myspace posts to be perceived as threats.

The testimony of Washburne and Hoover also support a reasonable juror's conclusion that Voneida intentionally or knowingly made threatening statements. Both Washburne and Hoover testified that Voneida had a morbid sense of humor and that he often made statements that were intended to shock people. (See id. at 12, 32, 40). They further testified that while they did not perceive Voneida's statements as threats, they understood why other people would be disturbed by the statements. (See id. at 20, 42). Hoover acknowledged that other people viewing the statements might perceive them as violent and threatening. (Id. at 42). This testimony, especially coming from two individuals who identified as long-time friends of Voneida's, further supports a reasonable juror's conclusion that Voneida posted the statements on his Myspace page with the intent or knowledge that they would be perceived as threats.

Finally, although it does not directly establish Voneida's state of mind at the time he posted the statements on Myspace, evidence in the record also suggested that Voneida was angry and had violent tendencies.  Most notably, Voneida posted on Myspace a cartoon depiction of himself holding a gun and a bloody knife with the caption:

> For all the times I grit my teeth
> Until they broke and bled.
> Calmly standing where I was, and
> Killing you all in my head.
>
> You will reap what you have sown
> Over and over again
> Until you see what you have grown…

(Evidentiary Hearing Exhibit 3).  Evidence also indicated that Voneida still had lingering anger about his recent divorce when he posted the statements on Myspace.  In addition, he had recklessly fired a gun at a stop sign when he was a teenager.  (See Doc. 44 at 55-56, 80; Evidentiary Hearing Exhibit 6).  This evidence— viewed alongside the testimony of Voneida, Hoover, and Washburne, the timing of Voneida's statements, and Voneida's access to firearms—provides ample support for a reasonable juror to conclude that Voneida intentionally made threatening statements, or that he knew his statements would be perceived as threats.

We conclude Voneida has not met his burden to show it is more likely than not that no reasonable juror would have convicted him.  In light of all of the above

evidence, reasonable jurors could readily conclude that Voneida acted with a purposeful or knowing mindset as required by <u>Elonis</u>.[6]

**V.**   <u>**Conclusion**</u>

We will deny the petition for writ of habeas corpus.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    January 31, 2022

---

[6] We do not reach the issue of whether a *mens rea* of recklessness is sufficient to convict under Section 875(c).